**\*NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JANESSA SMITH, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. 3:10-cv-02563 |
| v. | : | |
| | : | |
| TA OPERATING, LLC, | : | **OPINION** |
| | : | |
| Defendant. | : | |

**WOLFSON, United States District Judge**:

      Defendant TA Operating ("TA" or "Defendant") moves for Summary Judgment on Plaintiff Janessa Smith's ("Plaintiff") one-count Complaint, asserting violations of the New Jersey Conscientious Employment Protection Act ("CEPA"). Specifically, Plaintiff alleges that a fellow TA employee threatened her physically and emotionally, which induced Plaintiff to believe that the employee intended to imminently harm her. Plaintiff contends that TA discharged her in retaliation for Plaintiff's report of that alleged assault to her supervisor in contravention of CEPA. For the reasons set forth below, Defendant's motion is **DENIED**.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

      Plaintiff worked as a service writer at the TA truck service facility in Columbia, New Jersey. (Falk Dep. at 15:3-7, 21:6-22.) As a service writer, Plaintiff would greet customers, write work orders, get parts for the mechanics, and ensure that the work orders were paid out when the mechanics finished repairs. (Id. at 21:6-12.) On May 25, 2009, 180 days after she

---

[1] The description below relies on Plaintiff's account of what occurred on the night of August 27, 2009, as well as the testimony of Plaintiff's manager, Mark Falk. Unless otherwise noted, the facts below are undisputed.

1

began working at TA, Plaintiff's manager Mark Falk ("Falk") conducted an evaluation of Plaintiff's work performance.  (Falk Cert., Ex. B.)  Falk documented his review on a "Truck Service Advisor (TSA) Employee Evaluation Form."  (Id.)  On each Employee Evaluation Form, the reviewer rates the employee on attendance, personal appearance, job knowledge, safety/sanitation, personal relations, housekeeping, customer service, operational standards, and initiative.  (See Id.)  For each of those categories, the reviewer rates the employee as "O" for "Outstanding," "E" for "Effective," or "U" for "Unsatisfactory."  (Id.)  According to Falk, the review process is "[s]ubjective in nature," but follows guidelines enumerated on the Employee Evaluation Form, describing what sort of conduct merits each of the three possible ratings in each category.  (Falk Dep. at 132:3; Falk Cert., Ex. B.)

On Plaintiff's May 25, 2009 evaluation, Falk gave Plaintiff one "Outsanding" rating, six "Effective" ratings, and two "Unsatisfactory" ratings.  (Falk Cert., Ex. B.)  At the bottom of the form, Falk wrote two notes.  (Id.)  First, Falk asked that Plaintiff's husband ("Mr. Smith") stay away from the station, except when picking Plaintiff up and dropping her off.  (Id.)  Second, Falk noted that Plaintiff would earn a "merit increase" once she completed training.  (Id.)  On July 15, 2009, Falk gave Plaintiff a "Pay Rate Change," increasing her pay rate from $10.00 to $10.33.  (Woodruff Cert., Ex. F.)  On August 19, 2009, Falk attempted to give Plaintiff another merit increase, which would have raised Plaintiff's pay rate to $11.00.  (Woodruff Cert., Ex. G.)  Falk testified that Plaintiff earned the merit increase for "good job performance."  (Falk Dep. at 145:22-146:2.)  However, the TA PeopleSoft computer software, which authorized pay increases, permitted a 3% maximum increase of $0.33 per hour, preventing the additional raise Falk sought.  (Id. at 159:8-11.)

On July 10, 2009, Falk filled out an "Employee Counseling and/or Separation Report"

2

documenting an alleged violation of company policy.  (Falk Cert., Ex. C.)  In that document, Falk described the violation as "Janessa's husband having altercations with drivers [and] employee's [sic].  Has been told on eval [sic] in May 2009 to not let this happen."  (Id.)  Falk explained that Mr. Smith would stay at the station after dropping Plaintiff off, giving unsolicited advice to the mechanics.  (Falk Dep. at 162:6-7.)  Falk wrote that a failure to improve would result in Plaintiff's "termination."  (Falk Cert., Ex. C.)  Plaintiff did not sign the document, indicating to Falk that she did not agree with the allegations against her husband.  (Id.; Falk Dep. at 172:24-173:2.)

On August 21, 2009, Plaintiff worked the nightshift at the Columbia TA truck service station. (Smith Dep. at 17:14-18.)  At approximately 3:00 AM, Plaintiff observed a "jeep" in the service garage at the TA facility.  (Id. at 18:8-15.)  Plaintiff then saw daytime truck service advisor ("TSA") Ron Spinelli ("Spinelli") step out of the driver side of that vehicle.  (Id. at 16:25-17:3, 18:13-15.)  TSA Shawn McCaughey ("McCaughey") stood at the front of the vehicle, and opened the hood.  (Id. at 18:8-11.)  Plaintiff observed McCaughey using "the AC unit machine" on what Plaintiff believes was Spinelli's car.  (Id. at 21:20-23.)  Additionally, McCaughey took an unopened windshield wiper blade, which he explained was for his wife's car.  (Id. at 25:20-26:1.)  Believing these actions were against company policy, Plaintiff reported her observations to assistant manager Bart Moon that morning at approximately 8:00 AM, as well as to Falk on August 25, 2009 four days later.  (Id. at 26:23-27:2, 28:1, 33:24-34:7.)

On August 27, 2009, Mr. Smith dropped Plaintiff off at work.  (Id. at 37:18.)  Plaintiff arrived approximately 25 minutes before midnight.  (Id. at 36:19-20.)  When she walked into the service area, Plaintiff greeted lead TSA Robert Richdale ("Richdale") and evening mechanic Dave Lagora ("Lagora"), after which she walked into the mechanics' area and lit a cigarette.  (Id.

3

at 39:2-10.) While Plaintiff was smoking, McCaughey approached her with a long metal bar in his hand. (Id. at 39:13-14; 43:18-21.) Plaintiff described the bar as a "long tool[]," larger than usual mechanics tools because it is used to repair tractor trailers. (Id. at 43:16-18.) Plaintiff explained that the mechanics' area is "a very small space," about eight feet wide, with tool boxes lining the walls and tool display in the middle, which made the room even tighter. (Id. at 42:22; 48:9-12.) Because of the small space, Plaintiff had to move out of McCaughey's way as he walked toward her. (Id. at 43:8-10.) When Plaintiff asked McCaughey why he appeared upset, McCaughey called Plaintiff a "rat," and asked "why can't you keep your mouth shut[?]" (Id. at 40:17-21.) Specifically, McCaughey noted that Falk had spoken with him, and that "now we can't work on our own vehicles," indicating to Plaintiff that he was referring to Plaintiff's report to Falk a few days earlier regarding the alleged violation of company policy. (Id. at 41:18-22.)

Plaintiff testified that McCaughey appeared angry, based on his "words . . . his demeanor, the way he flexed, the way he moved, [and] the way he walked." (Id. at 44:15-18.) As McCaughey spoke to Plaintiff, he slammed his door and threw the tool he was carrying into a drawer right next to Plaintiff. (Id. at 42:35, 43:14-15; 44:2-5.) McCaughey was only a few feet from Plaintiff as he threw the tools in her direction. (Id. at 44:2-5.) While none of the tools hit Plaintiff, they "bounced" near her. (Id. at 44:7-8.) Plaintiff described the encounter as "very intimidating," and felt verbally assaulted. (Id. at 16:14-16; 54:24-25.)

After the encounter with McCaughey, Plaintiff spoke with Richdale, the lead TSA on duty the night in question. (Id. at 38:3-4, 58:12-16.) At this point, Plaintiff's eyes were watering and she was "shaky." (Id. at 60:6-7.) After Plaintiff told Richdale that she got into an argument with McCaughey, Richdale interrupted Plaintiff, asking her "what do you want to do?" (Id. at 60:7-11.) When Plaintiff asked Richdale what she should do, Richdale responded, "you can still

4

catch him before he gets to the toll." (Id. at 60:12-14.) Plaintiff interpreted this to mean that she should contact her husband and ask him to pick Plaintiff up from work. (Id. at 55:16-18, 56:1-4, 60:15-16.) Falk claims that he did not know that Plaintiff was given permission to leave work on the morning of August 28, 2009. (Falk Cert., ¶ 4.) Falk also contends that Richdale, "a Lead Truck Service Advisor at the time of Plaintiff's employment, did not have authority to change work schedules or to relieve any employee of their shift." (Id. at ¶ 3.) Neither Falk, the manager of the station, nor Moon, the assistant manager, were present that night. (Falk Dep. at 18:17-21, 19:11-15, 78:19-21.)

Plaintiff responded to Richdale, "I don't want to leave." (Id. at 61:5-6.) However, Richdale continued to ask Plaintiff "what do you want to do." (Id. at 61:6-10.) At that time, Plaintiff had started to cry. (Id. at 63:25-64:1.) Plaintiff called her husband, told him that she had a "confrontation" with McCaughey, and asked Mr. Smith to pick her up. (Id. at 61:15-17, 64:1-2, 8-9.) Plaintiff stayed behind the service counter until her husband pulled into the parking lot. (Id. at 64:17-19.) When Mr. Smith arrived, according to Plaintiff, he "bumped" a tire display, causing two or three tires to fall over. (Id. at 65:6-7, 65:15.) TA mechanic Lagora, however, recalled Mr. Smith's car "flying" in front of station and "slaming [sic]" into tire display. (Falk Cert., Ex. D.)

Plaintiff described her husband's demeanor as "upset," and "annoyed." (Smith Dep. at 74:19-21.) According to Plaintiff, Mr. Smith got out of the car and walked up to McCaughey, who stood on a raised platform outside the service station. (Id. at 75:6-12.) Mr. Smith then approached McCaughey until the two were standing "less than a foot apart." (Id. at 75:16-17.) Plaintiff's husband then began asking McCaughey about the confrontation with his wife. (Id. at 75:17-22.) Plaintiff tried to persuade her husband to leave, at which point Richdale and Lagora

5

came out to where Mr. Smith was standing and McCaughey returned inside. (Id. at 76:18-20; 76:22.) Mr. Smith then confronted Richdale about the incident. (Id. at 77:1-5.) Plaintiff "pleaded" with the two men to stop, and pushed Mr. Smith away from Richdale. (Id. at 79:16-22, 80:9-10.) Richdale and Lagora returned inside, while Mr. Smith went to his vehicle. (Id. at 80:20-23.) Plaintiff claims a "fuel girl" had called security, though, by the time the security guard arrived, the argument was over. (Id. at 82:16-83:7.) Plaintiff testified that she went to the service area, got her things, and clocked out. (Id. at 81:5-8.)

After Plaintiff left the service station, she reported the incident to a security guard, whom TA hired to deal with "a theft problem" in the convenience store attached to the service station. (Id. at 84:1-12.) After arriving at home, Plaintiff called the State Police to report the incident, as well.[2] (Id. at 87:14-21.) Plaintiff explained that she called because she saw "a wrongdoing" in McCaughey's actions that evening. (Id. at 89:5-7.) Specifically, Plaintiff reported McCaughey's "confrontation" and "aggression." (Id. at 88:8-17.) However, when the officer asked if Plaintiff wanted him to investigate, she declined because she didn't want to lose her job. (Id. at 89:9-11.) It appears the State Police did not take any further action. (Id.) The next morning, Plaintiff spoke with a representative from the TA human resources department, who informed her that she had to speak to her manager—Falk. (Id. at 99:4-13.)

Plaintiff then called the service station to speak with Falk. (Id. at 93:6-7.) She was unable to reach him until "around 12 noon" on August 28, 2009. (Id. at 94:19-20.) When Plaintiff did speak with Falk, she explained what happened between her and McCaughey. (Id. at 94:23.) Specifically, Plaintiff told Falk that McCaughey confronted her, that McCaughey was

---

[2] Defendant does not dispute that Plaintiff reached out to the Police. Indeed, Plaintiff provided phone records to corroborate her account, pointing to a 13-minute phone call placed at 1:11 AM on August 28, 2009. (Woodruff Cert., Ex. E.)

6

"very angry," and that he called Plaintiff "a rat." (Id. at 95:23-96:5.) Moreover, Plaintiff testified that she informed Falk that McCaughey's demeanor was "violent." (Id. at 96:13.) Plaintiff recalled telling Falk that she was afraid, and specifically "afraid to work with [McCaughey]." (Id. at 96:14-16.) According to Plaintiff, Falk did not say much, mostly responding with "uh-hum," and ending the conversation by saying he would get back to her. (Id. at 96:19-22.)

Falk has a different recollection of the conversation. According to Falk, Plaintiff told Falk about the confrontation with McCaughey, but nothing about McCaughey "throwing wrenches around and doing things that she perceived to be violent." (Falk Dep. at 90:11-17.) He did not recall whether Plaintiff described feeling "intimidated," and did not recall her describing McCaughey's actions as "violent." (Id. at 91:25-92:4.) According to Falk, he did not hear about McCaughey throwing tools at Plaintiff until the day before his deposition. (Id. at 91:2-6.) Falk admits that he did not ask anyone if Plaintiff was "crying or upset" that evening. (Id. at 98:25-99:2.)

At 3:00 PM on August 28, 2009, three hours after Plaintiff first spoke with Falk, Falk left Plaintiff a message. (Id. at 92:14-16; Smith Dep. at 96:25-97:1.) The message indicated: "Scott and I accept your resignation." (Smith Dep. at 97:9.) Scott Buzelli was the regional manager for the service station at which Plaintiff worked. (Id. at 97:11; Falk Dep. at 101:17-19.) Plaintiff returned Falk's call immediately after hearing it, and informed him that she did not resign. (Smith Dep. at 97:13, 97:20-23.) According to Plaintiff, Falk responded "Uh-huh. Okay. Good-bye." (Id. at 97:24.)

Falk agrees with Plaintiff regarding the content of his message. (Falk Dep. at 97:13-15.) Falk admits that Plaintiff did not leave any document indicating that she resigned and did not

7

resign over the phone. (Id. at 97:16-20.) Additionally, Falk admitted that, to his knowledge, Plaintiff never informed any TA employee that she resigned. (Id. at 100:11-22.) Falk acknowledges that Plaintiff informed him she was not resigning after listening to Falk's message. (Id. at 102:3-4.) Nonetheless, according to Falk, Plaintiff resigned by "walking off the job and leaving and calling her husband to come back and pick her up." (Id. at 100:24-101:1.) Falk also claims he told Plaintiff, "I am accepting your resignation due to the issues that happened the night before. You were warned in the past of your husband coming down here twice before." (Id. at 102:6-9.)

Falk prepared a Personnel Action Form documenting Plaintiff's termination, dated August 27, 2009.[3] (See Falk Cert., Ex. A.) Under the "Additional Comments or Detailed Reason for Termination" portion of that form, Falk wrote: "Walked off job and altercations with fellow employee's [sic] on 8/27/09." (Id.) Falk explained at his deposition that his comment regarding "altercations with fellow employees" on the form referred to "the altercations between Plaintiff's husband and Mr. Richdale and Mr. McCaughey." (Falk Cert., ¶ 6.)

On April 13, 2010, Plaintiff filed a Complaint in the Superior Court of New Jersey. Specifically, Plaintiff alleged that Defendant violated CEPA by firing Plaintiff because Plaintiff reported a trespass and theft of services, perpetrated by two fellow TA employees. On motion by Defendant, the action was removed to this Court. In an Order dated August 17, 2010, this Court dismissed Plaintiff's CEPA claim without prejudice and with leave to amend. On August 25, 2010, Plaintiff filed an Amended Complaint, further contending that Plaintiff reported a TA

---

[3] The altercation between Plaintiff and McCaughey took place on the night of August 27, 2009. (Smith Dep. at 36:12-13.) Plaintiff did not speak with Falk until the following afternoon, on August 28, 2009. (Id. at 94:19-20.) On the Personnel Action Form, both the "Effective Date" of the termination and Falk's signature at the bottom of the page are dated "8/27/09." (Falk Cert., Ex. A.) The Court presumes, without finding, that this represents a typographical error, and that the form was not filled out on August 27, 2009, before the incident occurred.

8

employee's theft of services, trespass, and assault against Plaintiff.  In an Order dated March 29, 2011, this Court dismissed those portions of Plaintiff's CEPA claim relating to trespass and theft of services.  Following discovery in the instant matter, Defendant moves for summary judgment on Plaintiff's CEPA claim.

## II.  SUMMARY JUDGMENT STANDRARD

Courts will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. See Id. at 252.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts "in the light most favorable to the [non-moving] party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion." Celotex v. Catrett, 477 U.S. 317, 323 (1986).  The non-moving party then carries the burden to "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324.  Moreover, the non-moving party may not rest upon the mere allegations or denials of its pleading. Id. at 324; Maidenbaum v. Bally's Park Place, Inc., 870 F.Supp. 1254, 1258 (D.N.J. 1994).  The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  A mere "scintilla of evidence . . . will be insufficient." Anderson, 477 U.S. at 252.  Specifically, "while

the jury may draw reasonable inferences, it may not be permitted to reach its verdict merely on the basis of speculation or conjecture . . . there must be evidence upon which logically its conclusion may be based." Community Preschool & Nursery of East Liberty, LLC v. Tri-State Realty, Inc., No. 10-2702, 2011 WL 2198946, at *127 (3d Cir. Jun. 7, 2011) (quoting Fitzpatrick v. Natter, 599 Pa. 465, 485-86 (2008)).

## III. DISCUSSION

In relevant part, CEPA prohibits employers from taking "any retaliatory action against an employee because the employee . . . [o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes . . . is fraudulent or criminal." N.J.S.A § 34:19-3(c)(2). To establish a *prima facie* CEPA claim under N.J.S.A. § 34:19-3(c)(2), a plaintiff must demonstrate that: 1) she objected to, or refused to participate in, an activity, policy or practice which she reasonably believed to be fraudulent or criminal; 2) she engaged in a protected "whistle blowing" activity as described in N.J.S.A. 34:19-3(c); 3) an adverse employment action was taken against her; and 4) a causal connection exists between the whistle-blowing activity and the adverse employment action. Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003); see also Wheeler v. Twp. of Edison, 326 Fed. Appx. 118, 123 (3d Cir. 2009). If a Plaintiff establishes a *prima facie* CEPA violation, the burden shifts to the Defendant to "articulate some legitimate, non-[retaliatory] reason" for Plaintiff's termination. Woodson v. Scott Paper Co., 109 F.3d 913, 920 n.2 (3d Cir. 1997) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). "Once the defendant articulates a legitimate reason for the adverse employment action, the presumption of retaliatory discharge created by the prima facie case disappears and the burden shifts back to the plaintiff," who must show "both that the reason [given by the employer] was false, and that [retaliation] was the real reason. Blackburn v. UPS,

Inc., 179 F.3d 81, 92 (3d Cir. 1999) (quoting Woodson, 109 F.3d at 920 n.2) (alterations in original).

As Defendant has moved for summary judgment, the facts must be construed in the light most favorable to the Plaintiff.  Matsushita, 475 U.S. at 587.  With that in mind, the Court will evaluate the elements of Plaintiff's CEPA claim, considering whether each presents a genuine issue of material fact for trial.

**A.  Criminal Activity**

Initially, Defendant insists that McCaughey's actions do not constitute assault as a matter of New Jersey law, and thus do not qualify as 'criminal' under N.J.S.A. 34:19–3(c)(2).  Defendant contends that McCaughey's actions do not fit the statutory definition of simple assault under N.J.S.A. 2C:12-1(a).  However, CEPA does not require Plaintiff to show that she knew the precise law which would render McCaughey's conduct unlawful, nor that McCaughey's conduct, in fact, "rise[s] to the level of an actual crime."  Estate of Roach v. TRW, Inc., 164 N.J. 598, 613 (2000); see also Mehlman v. Mobil Oil, 153 N.J. 163, 193-94 (1998) ("The object of CEPA is not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to . . . conduct that they reasonably believe to be unlawful.")  While "the trial court must identify a statute, regulation, rule, or public policy that closely relates to the complained-of conduct," a Plaintiff does not have to "allege facts that, if true, actually would violate that statute, rule, or public policy."  Dzwonar, 177 N.J. at 463.  Indeed, the statute specifically protects an employee who "[o]bjects to, or refuses to participate in any activity, policy, or practice which the employee *reasonably believes* . . . is fraudulent or criminal."  N.J.S.A. 34:19-3(c)(2) (emphasis added).

Accordingly, the Court rejects Defendant's argument that in order to prevail, Plaintiff

11

must show that McCaughey actually assaulted her. Plaintiff must demonstrate only that she had "an objectively reasonable belief" that McCaughey's actions were comparable to an assault against her. Mehlman, 153 N.J. at 193. This has two components—first, that Plaintiff, in fact, harbored the "belief" that the conduct was unlawful; and, second, that her belief was "objectively reasonable." Id.

As to the first inquiry, Plaintiff stated that she felt verbally "assaulted" and "intimidated" by McCaughey, leaving her "shaky," and eventually causing her to cry. (Smith Dep. at 16:14-16; 60:6-7; 63:25-64:1.) Additionally, she reported the encounter to Richdale, an on-duty security guard, Falk, TA Human Resources, and the New Jersey State Police. (Id. at 38:3-4; 58:12-16; 84:1-12; 87:14-21; 94:23; 99:4-13.) That Plaintiff reported the incident to so many individuals—most notably, to the State Police—supports her assertion that she believed that McCaughey's conduct amounted to an unlawful act. (Id. at 89:5-7.) Defendant suggests that Plaintiff's occasional description of the events as an "argument," rather than consistently as an "assault," shows that she does not actually believe McCaughey assaulted her. Def. Br. at 12. However, Plaintiff need not use the legal terminology in defining the act she considered unlawful. See Mehlman, 153 N.J. at 193 ("Specific knowledge of the precise source of the public policy is not required.") Regardless, Plaintiff also described the incident as an "assault." (Smith Dep. at 16:14-16.) Moreover, she described how the encounter left her "afraid" and "intimidated." (Id. at 16:14-16; 96:14-16.) Based on the testimony, the Court finds that a reasonable jury could conclude that Plaintiff harbored the belief that McCaughey's conduct was unlawful.

The second inquiry, whether Plaintiff's belief was "objectively reasonable," also raises a genuine issue of material fact for trial. Importantly, neither party deposed additional witnesses,

12

including McCaughey, to ask for their account of the night in question. Indeed, the record includes only Plaintiff's description of her encounter with McCaughey. Despite this, Defendant argues that even if Plaintiff believed McCaughey's actions were criminal, given Plaintiff's description of the events, her belief was not objectively reasonable. However, McCaughey's actions, as Plaintiff describes them, could easily lead a reasonable person to feel the threat of violence. Accordingly to Plaintiff, McCaughey approached Plaintiff with a long metal bar in his hand, large enough to use on a tractor trailer. (Id. at 39:13-14; 43:16-21.) McCaughey slammed the door and threw the tool he was carrying in Plaintiff's direction. (Id. at 42:35, 43:14-15.) McCaughey was only a few feet from Plaintiff as he threw the tool. (Id. at 44:2-5.) The confrontation occurred in a very small space, only about eight feet wide. (Id. at 42:22; 48:9.) In addition, the tool boxes that lined the walls, coupled with the display in the center of the room, made the space even tighter. (Id. at 42:22; 48:9-12.) Plaintiff testified that she and McCaughey were close enough that she had to move out of McCaughey's way as he walked. (Id. at 42:22, 43:8-10.) The close proximity between Plaintiff and McCaughey, coupled with how McCaughey acted, support the Court's finding that a reasonable jury could determine that Plaintiff was reasonable to feel intimidated by McCaughey's threat of violence. (Id. at 54:24-25.)

Moreover, McCaughey's actions were arguably consistent with his animosity towards Plaintiff. Days before, Plaintiff had reported McCaughey to her supervisor for working on Spinelli's car. (Id. at 26:23-27:2, 28:1, 33:24-34:7.) Just before McCaughey threw the tools towards Plaintiff, he called her a "rat" and asked why Plaintiff couldn't "keep [her] mouth shut." (Id. at 40:17-21.) Plaintiff testified that McCaughey was clearly angry toward her, based on his "words . . . his demeanor, the way he flexed, the way he moved, [and] the way he walked." (Id. at 44:15-18.) McCaughey's actions, coupled with the things he said and his apparent

13

motivations, could lead a reasonable jury to conclude that Plaintiff was, herself, reasonable in feeling that McCaughey acted violently.  (Id. at 96:13.)

### B.  Reporting the Activity

Next, Defendant contends that Plaintiff did not report her belief that McCaughey engaged in illegal conduct.  The parties do not dispute that Plaintiff contacted Falk on August 28, 2009, to discuss the events of the preceding evening, nor that Falk was Plaintiff's manager.  (Id. at 27:25-28:1; 94:19-20.)  However, the parties dispute what was said during Plaintiff's conversation with Falk.  Plaintiff contends she told Falk that McCaughey angrily confronted her, called her "a rat," and said "now we can't do our vehicles because you don't know how to keep your mouth shut." (Id. at 95:23-96:5.)   Plaintiff also claims that she informed Falk of McCaughey's "violent" demeanor, and that, as a result, she was afraid of McCaughey.  (Id. at 96:13-16.)  In contrast, Falk claims that Plaintiff never informed him regarding McCaughey's violent conduct.  (Falk Dep. at 90:11-17.)  Falk recalled neither Plaintiff describing her feelings of intimidation nor her description of McCaughey's conduct as violent.  (Id. at 91:25-92:4.)  Finally, Falk did not recall Plaintiff giving any indication that she feared McCaughey.  (Id. at 92:5-7.)

Based on Falk's version of events, Defendant contends that Plaintiff failed to demonstrate that she "complained of an assault where she felt she was in fear of *imminent* serious bodily harm."  (Def. Br. at 5-6.)  However, all that CEPA requires is that Plaintiff "object to" McCaughey's conduct.  N.J.S.A. 34:19-3(c)(2).   Here, Plaintiff reported the incident to numerous individuals—including her manager, Falk—and informed them of the incident. (Smith Dep. at 94:19-23.)  Since Plaintiff and Falk disagree over how Plaintiff reported the incident—namely, whether she described McCaughey's behavior as violent and the encounter as intimidating—there is a question of fact as to whether Plaintiff reported the alleged assault to

14

Falk. Such a determination requires weighing the credibility of both participants, an evaluation inappropriate at the summary judgment stage. See Anderson, 477 U.S. at 255 (holding that "credibility determinations . . . are jury functions, not those of a judge.") As there is a genuine issue of material fact as to this element, summary judgment is inappropriate.

**C. Adverse Employment Action and Causal Nexus**

The parties do not dispute that Plaintiff was effectively terminated. Thus, Defendant concedes that Plaintiff's termination constitutes an adverse employment action. However, Defendant argues that, even if Plaintiff reasonably believed McCaughey acted unlawfully and reported that belief to Falk, there is no evidence of a causal relationship between Plaintiff's report and her discharge. To establish a causal nexus, Plaintiff must show that she was fired because she reported McCaughey's alleged assault. See Dzwonar, 177 N.J. at 462. Causation "may be reasonably inferred from the circumstances surrounding the employment action, including temporal proximity between the protected activity and the adverse action, and inconsistencies or contradictions in the employer's proffered legitimate reasons for its action." Robles v. United States Envtl. Universal Servs., Inc., 2012 U.S. App. LEXIS 5270, at *6 (3d Cir. Mar. 13, 2012) (citing Maimone v. City of Atlantic City, 188 N.J. 221, 236 (2006); Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000)) (internal citations omitted).

Here, Plaintiff was fired within hours of her phone call with Falk. Plaintiff informed Falk of the incident with McCaughey at 12:00 PM on August 28, 2009. (Smith Dep. at 94:19-20.) At 3:00 PM that day, three hours later, Plaintiff received Falk's message, which notified Plaintiff of her termination. (Id. at 97:9.) While "[t]emporal proximity between protected activity and adverse employment actions alone does not suffice to demonstrate causation in a CEPA claim," it is still "probative of the causal connection. Blevis v. Lyndhurst Bd. of Educ., 2009 U.S. Dist.

15

LEXIS 89908, at *26-27 (D.N.J. Sept. 25, 2009) (finding a causal nexus where Plaintiff was fired within one week of filing a lawsuit against his employer).

Defendant insists that the temporal relationship between the report and the discharge is insufficient to establish a causal link. In support of this assertion, Defendant cites to Milham v. Cortiva Education, 302 Fed. Appx. 70 (3d Cir. 2008), where the Third Circuit affirmed the trial court's grant of summary judgment on a CEPA claim. In Milham, however, plaintiff tried to establish a temporal causal nexus between his report in October 2008 and his discharge in the middle of November that same year. Milham v. Cortiva Educ., Inc., 2007 U.S. Dist. LEXIS 79793, at *26 (E.D. Pa Oct. 25, 2007); aff'd 302 Fed. Appx. 70 (3d Cir. 2008). Here, unlike in Mihlam, Falk discharged Plaintiff within hours, not weeks, of her report.

Moreover, Plaintiff has provided additional circumstantial evidence from which a causal nexus can be inferred. For example, Plaintiff points to Falk's two previous attempts to raise Plaintiff's pay rate, both within two months of Plaintiff's discharge. (Woodruff Cert., Exs. F, G.) Falk attempted to put through the second pay raise just nine days before the incident. (Woodruff Cert., Ex. G.) Falk testified that Plaintiff earned the pay raise, or "merit increase," for "good job performance." (Falk Dep. at 145:22-146:2.) Significantly, despite the fact that Falk had already addressed issues regarding Mr. Smith's presence at the service station, Falk still believed that Plaintiff's performance warranted an additional "merit increase." Therefore, the fact that Falk attempted to increase Plaintiff's salary days before he terminated her is certainly relevant to the causal inquiry because it casts doubt on Falk's decision to discharge Plaintiff. In other words, Falk's given reason for Plaintiff's termination – Mr. Smith's behavior – is called into question. See Capell v. Lowe's Home Improvement, 2005 U.S. Dist. LEXIS 22463, at *7-8 (D.N.J. Sept. 23, 2005) (noting that the Court would find a genuine issue of material fact where Plaintiff

16

received a merit-based salary increase days before termination).

Plaintiff also points to Falk's Personnel Action Form, which documented Plaintiff's termination. (See Falk Cert., Ex. A.) Specifically, Plaintiff notes that Falk explicitly wrote "altercations with fellow employee's [sic] on 8/27/09" as a reason for Plaintiff's discharge. (Id.) While Falk testified that "altercations with fellow employees" referred to "the altercations between Plaintiff's husband and Mr. Richdale and Mr. McCaughey," Plaintiff contends that "altercations with fellow employees" refers specifically to Plaintiff's encounter with McCaughey—which is the basis of Plaintiff's complaint of the threat of violence. (Falk Cert., ¶ 6.) This dispute requires a weighing of Falk's credibility, which, as noted above, is a task reserved for the trier of fact. See Anderson, 477 U.S. at 255.

Finally, Defendant suggests that there is no evidence that Plaintiff's phone call angered or upset Falk, and that, as a result, there must be no causal connection between Plaintiff's phone call and her termination. The Court acknowledges that Falk's reaction is probative of the causation inquiry. See Robles, 2012 U.S. App. LEXIS 5270, at *7 (acknowledging that the employer's lack of reaction to Plaintiff's report "undercut" proof of causation). However, it is far from dispositive on this motion. Indeed, the relevant evidence on the causation question, including Falk's written reasons for discharging Plaintiff, Falk's recent attempts to raise Plaintiff's pay rate, the temporal proximity between Plaintiff's report and her discharge, and, indeed, Falk's reactions all raise genuine issues of material fact for trial.

## D. Non-Retaliatory Reason and Pretext

Defendant argues that, assuming Plaintiff can establish a *prima facie* CEPA claim, the undisputed facts do not show that Defendant's alleged non-retaliatory reason for firing Plaintiff was a pretext for the termination. To establish pretext for the purposes of summary judgment,

17

"[t]he employee . . . must only raise a genuine issue of fact suggesting pretext by providing some evidence establishing a reasonable inference that the employer's proffered reason for the adverse employment decision was weak, implausible, inconsistent, incoherent or contradictory so as to be unworthy of credence."  Bowles v. City of Camden, 993 F. Supp. 255, 262 (D.N.J. 1998). Importantly, a pretext analysis should not focus on "whether the employer [was] wise, shrewd, prudent, or competent," but rather whether the employer acted because of the report of illegal activity.  Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).  Where there is "a direct clash of facts" regarding the employer's stated reason for discharging Plaintiff, summary judgment should be denied.  Gary v. Air Group, Inc., 2007 U.S. Dist. LEXIS 72693, at *16 (D.N.J. Sept. 28, 2007).  In that connection, "[s]ummary judgment is improper if the plaintiff points to evidence which raises doubt about the employer's proffered basis," though "the plaintiff's evidence need not necessarily lead to the conclusion that the employer *did not* act for the [non-retaliatory] reasons."  Bowles, 993 F. Supp. at 262 (citing Geary v. Visitation of the Blessed Mary Parish Sch., 7 F.3d 324, 331-32 (3d Cir. 1993); Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995); Sorba v. Penn. Drilling Co., 821 F.2d 200, 205 (3d Cir. 1987), cert. denied, 484 U.S. 1019 (1988)) (emphasis added).

The Court finds that Plaintiff has raised a genuine issue of material fact with regard to pretext.  Defendant contends that Plaintiff's termination resulted from her walking off the job on August 27, 2009, coupled with her husband's actions that night.  Falk testified that, prior to Plaintiff's discharge, mechanics complained to him that Mr. Smith giving unsolicited advice to mechanics," and generally loitering in the service station. (Falk Dep. at 162:6-7.)  Falk's July 10, 2009 "Employee Counseling and/or Separation Report" set forth that Mr. Smith had "altercations with drivers [and] employee's [sic]," and noted that, if the problem continued,

18

Plaintiff would be terminated. (Falk Cert., Ex. C.) Based on these facts, Defendant argues that Mr. Smith's actions justified Plaintiff's termination.

However, Plaintiff has pointed to evidence sufficient to raise a genuine issue of material fact with regard to the credibility of Defendant's given reason for the discharge. When Falk called Plaintiff at 3:00 PM on August 28, 2009, he informed Plaintiff that he accepted her "resignation." (Falk Dep. at 97:13-15.) However, Plaintiff did not indicate that she was resigning, either verbally or in writing, to Falk or any TA employee. (Id. at 97:16-20; 100:11-22.) In fact, Plaintiff told Falk that she was "not resigning." (Id. at 102:3-4.) According to Falk, Plaintiff resigned by "walking off the job and leaving and calling her husband to come back and pick her up." (Id. at 100:24-101:1.) Falk also claims that Mr. Smith's conduct justified Plaintiff's termination. (Id. at 102:6-9.)

In response, Plaintiff points to the same evidence she uses to establish causation, including her pay increases, the short time between her report and her termination, and the meaning of Falk's written reason for the discharge, "altercations with fellow employees," on Plaintiff's termination record. "There is neither logic nor case law which would counsel that the same evidence may not support both the plaintiff's initial burden of proving a causal connection for purposes of making a prima facie case and the plaintiff's final burden of casting doubt on the employer's proffered legitimate reason." Bowles, 993 F. Supp. at 264. As described more fully above, Plaintiff's arguments call into doubt whether Falk, in fact, discharged Plaintiff for the reasons he claims. Why Falk would attempt to raise Plaintiff's pay rate days before discharging her, and what Falk meant by "altercations with other employees," are both questions for trial. Suffice it to say, based on these issues, a reasonable jury could conclude that Falk decided to fire Plaintiff because Plaintiff objected to McCaughey's conduct. Thus, the inconsistencies and

19

uncertainties surrounding Defendant's proffered reason for the discharge raise genuine issues of material fact, precluding summary judgment.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that there are genuine issues of material fact with regard to Plaintiff's CEPA claim, precluding summary judgment. As a result, Defendant's motion for summary judgment on Plaintiff's CEPA claim is **DENIED.**

An order will be entered consistent with this Opinion.

Dated:  August 13, 2012                                             /s/    Freda L. Wolfson    
                                                                                             Freda L. Wolfson, U.S.D.J.